IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATIONAL EDUCATION FINANCIAL SERVICES, INC., et al., | : : : | CIVIL ACTION |
| v. | : : | |
| U.S. BANK, NATIONAL ASSOCIATION. | : : | NO. 12-6651 |

## MEMORANDUM

**Restrepo, J.**                                                                                                           **March 6, 2014**

On November 28, 2012, National Education Financial Services, Inc. and National Education Services, LLC (collectively "National Education") filed suit against U.S. Bank, National Association. Now before the Court is Defendant's motion to dismiss, in part, Plaintiffs' Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motion will be granted.

## I.  FACTS AND PROCEDURAL HISTORY

### A. The Formation of a Contract

The facts, as alleged in the Second Amended Complaint ("SAC"), are as follows: Plaintiffs are "established marketer[s], originator[s] and servicer[s] of federal and private student loans both for many student lending institutions and on [their] own account." SAC ¶ 7. Plaintiffs market these "education loans by working closely with college and university financial aid offices." *Id.* ¶ 8. In or around December of 2010, Defendant contacted Plaintiffs and expressed interest "in contracting National Education to market U.S. Bank's student loan product." *Id.* ¶ 12. In essence, Plaintiffs, using their expertise and contacts, "would market the U.S. Bank student loan product to hundreds of schools and incalculable numbers of students." *Id.* ¶ 13.

On or about February 18, 2011, the parties entered into a marketing agreement ("the Agreement") that is the basis for the dispute here. *Id.* ¶ 15. The Agreement was derived from a template provided by Plaintiffs, but substantially edited by Defendant. *Id.* ¶ 16. Defendant was represented by counsel, while Plaintiffs, two related corporations with more than fifty employees, Oral Arg. Tr. 4:5-7, ECF No. 23, were not represented, SAC ¶ 16.

## B. Relevant Terms of the Contract

Important terms of the Agreement, ECF No. 27, Ex. A, include:

- Section 2.1: "Obligations of U.S. Bank." Section 2.1 provides that Defendant agrees to (a) cooperate with Plaintiffs in the marketing of student loans; (b) let Plaintiffs use Defendant's marks; (c)-(d) provide timely responses to Plaintiffs; (e) monitor the business that comes from Plaintiffs' work under the contract so that Plaintiffs are adequately compensated; and, (f) provide a unique code that would allow Plaintiffs to list co-branded student loans on industry lender lists. *Id.* at 3.

- Section 2.6: "Reputation." Section 2.6 provides that each party acknowledges the importance of good will and the good reputation of the other parties in the education loan environment, and thus agrees to "take no action . . . that reasonably may be anticipated to reflect badly on any of the other Parties." *Id.* at 5.

- Section 5: "Termination." Section 5 provides detail about the termination process. Section 5.1 provides that the Agreement shall last for two years, "unless otherwise terminated earlier in accordance with Section 5.2 or Section 5.3." Section 5.2 ("General Termination") provides that "any Party may terminate this Agreement for convenience upon 60 days written notice to the other Parties." *Id.* at 7-8.

- Section 11.1: "Governing Law." Section 11.1 selects Delaware law as governing the terms of the Agreement. *Id.* at 13.

## C. The Performance and Termination of the Contract

The SAC further alleges that after executing the Agreement, Plaintiffs shifted approximately eighty-five percent of their resources to promoting and marketing Defendant's loan products. *Id.* ¶ 20. In doing so, Plaintiffs moved their business away from other national lending institutions and turned down opportunities for new business. *Id.* The SAC further

2

explains that the market for student loans is a highly competitive one, centering around a 75-day "window of opportunity," where schools decide what lenders may market their products to their students. *Id.* ¶ 22. This time period is resource intensive, and requires a large-scale commitment of resources from businesses like Plaintiffs. *Id.*

Despite the Agreement being signed late in the year, the first year was successful for Plaintiffs, who procured approximately four million dollars in disbursement volume for Defendant. *Id.* ¶ 28. During year two of the Agreement, Plaintiffs continued their work for Defendant, including during the intensive "window of opportunity." *Id.* Plaintiffs did so with the active encouragement of Defendant, including on March 8 and March 26, 2012. *Id.* ¶ 30. However, on March 27, 2012, Defendant directly notified educational institutions that it was immediately ending its student-loan line of business, including the very student-loan products that Plaintiffs were actively marketing. *Id*. ¶ 32. Two days later, on March 29, 2012, Defendant notified Plaintiffs of its decision to leave the market and terminate the Agreement. *Id.* ¶ 33. Because Plaintiffs were deep into the so-called "window of opportunity," they were unable to mitigate their damages, and thus were significantly harmed by this abrupt exit. *Id.* ¶ 34.

### D. Procedural History

Plaintiffs filed this suit on November 28, 2012 and filed a First Amended Complaint ("FAC") on February 25, 2013. The FAC contained nine counts, sounding in contract, quasi-contract and tort. On November 27, 2013, I dismissed each tort and quasi-contract claim in the FAC with prejudice, dismissed a claim alleging a breach of the covenant of good faith and fair dealing without prejudice, dismissed certain contract claims without prejudice, and denied the motion with regards to other breach of contract claims. *See Nat'l Educ. Fin. Servs., Inc. v. U.S.*

*Bank, N.A.*, 2013 WL 6228979 (E.D. Pa. Dec. 2, 2013). I also granted leave for Plaintiffs to file an additional amended complaint. *Id.*

On December 16, 2013, Plaintiffs filed the SAC. The factual averments of the FAC and SAC are identical. Rather than the nine counts contained in the FAC, the SAC has only two causes of action: breach of contract, and breach of the implied covenant of good faith and fair dealing. Defendant now seeks to dismiss the good faith and fair dealing count in its entirety, and seeks to dismiss the request for indirect damages contained in the breach of contract claim, which Defendant argues is precluded by the terms of the Agreement.

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the non-moving party. *See Bd. of Trs. of Bricklayers & Allied Craftsman Local 6 of N.J. Welfare Fund v. Wettlin Assocs.*, 237 F.3d 270, 272 (3d Cir. 2001). A court need not, however, credit "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level." *Id.* at 555. Although the Federal Rules impose no probability requirement at the pleading stage, a plaintiff must present "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of a cause of action. *Phillips v. Cnty of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

4

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Simply reciting the elements will not suffice. *See id.; see also Phillips*, 515 F.3d at 231. Finally, when, as here, a complaint contains attachments, examination of the attachments is proper when considering a motion to dismiss. *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## III. DISCUSSION

### A.   The Implied Covenant of Good Faith and Fair Dealing

Defendant first seeks to dismiss Plaintiffs' claim that Defendant breached the implied covenant of good faith and fair dealing. Under Delaware law, this covenant "inheres in every contract." *Winshall v. Viacom Intern., Inc.*, 55 A.3d 629, 636 (Del. Ch. 2011).[1] Accordingly,

> a party to a contract has made an implied covenant to interpret and to act reasonably upon contractual language that is on its face reasonable. This implied covenant is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain. It requires the Court to extrapolate the spirit of the agreement from its express terms and based on that "spirit," determine the terms that the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose. The Court then implies the extrapolated term into the express agreement as an implied covenant and treats its breach as a breach of the contract. The implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract. Despite these restrictions, Delaware courts apply this legal theory only in narrow circumstances.

*Chamison v. Healthtrust, Inc.*, 735 A.2d 912, 920-921 (Del. Ch. 1999), *quoted in Keating v. Applus+Technologies, Inc.*, No. 08-3320, 2009 WL 261091, at *3 (E.D. Pa. 2009). Further,

---

[1] Delaware law, as controlling the contract claims, also controls the good faith and fair dealing analysis. *See TriState HVAC Equip., LLP v. Big Belly Solar, Inc.*, 836 F. Supp. 2d 274, 280 (E.D. Pa. 2011) (After selection clause uses Massachusetts for breach-of-contract claim, "Massachusetts law similarly governs [a plaintiff's] claim for breach of the implied covenant of good faith and fair dealing, since the claim alleges a breach of duty implied in the agreement."); *Torain v. Clear Channel Broad.*, Inc., 651 F. Supp. 2d 125, 138 (S.D.N.Y. 2009).

"[g]ood faith does not envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of the parties' contract. Both necessarily turn on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally." *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 418-19 (Del. 2013).

For Plaintiffs to meet their pleading burden they must "allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581-82 (D. Del. 2007). "General allegations of bad faith conduct are not sufficient to state a claim for breach of the implied covenant of good faith and fair dealing." *Metro. Life Ins. Co. v. Tremont Grp. Holdings, Inc.*, No. 7092-VCP, 2012 WL 6632681, at *16 (Del. Ch. Dec. 20, 2012).

Finally,

> [t]he implied covenant does not apply when the subject at issue is expressly covered by the contract. . . . The doctrine thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer. In the Venn diagram of contract cases, the area of overlap is quite small.

*Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009) (internal quotations and citations omitted). Thus, the issue is not whether Plaintiffs, now dissatisfied with the Agreement, would have negotiated differently with the perspective of hindsight, but, given the spirit of the contract that exists, whether there are implied terms that a court should enforce. *See id*.

### i. The Agreement's Implied Obligations

The SAC lists six obligations that were allegedly implied in the Agreement:

1. "US Bank's obligation to timely advise National Education immediately of its decision to exit the student loan industry." SAC ¶ 41.

2. "US Bank's obligation to refrain from misleading National Education when US Bank was aware that it would be exiting the student loan industry." *Id*. ¶ 44.

3. "US Bank's obligation to respect the hard-earned relationships existing between National Education and the client schools." *Id*. ¶ 47.

4. "US Bank's obligation to respect the fact that National Education was a comparatively small business entity that had devoted almost all of its resources to the US Bank product and was therefore at great risk in the event that US Bank terminated the Agreement." *Id*. ¶ 50.

5. "US Bank's obligation to honor the cyclical nature of the student lending business and to make efforts to prevent an unnecessary expenditure of National Education's resources during the window of opportunity by terminating the Agreement before those expenditures were made." *Id*. ¶ 53.

6. "US Bank's obligation to allow National Education an opportunity to mitigate its damages in the event that US Bank made a decision to exit the student loan industry or to otherwise terminate the Agreement." *Id*. ¶ 56.

### 1. Implied Obligations One, Two, Four, Five and Six

Duties one, two, four, five and six, which each assert that Defendant should have notified Plaintiffs that it was leaving the student loan market, merely recast a term of the Agreement clearly covered by section 5 ("Termination") and thus necessarily fail. Specifically, these obligations assert that Defendant needed to provide Plaintiffs with sixty days of notice in a scenario where Defendant exited market altogether, so that Plaintiffs could better mitigate the damages suffered from the loss of Defendant's line of business:

> If the parties would have discussed the possibility that US Bank was going to quit the student loan industry in the near future, at the very least, National Education would have wanted notice of that decision – sixty (60) days would be consistent with the notice of termination provision in the Agreement. Thus, in January 2012 (or an earlier date), US Bank could have notified National Education that, while it would honor the Agreement for another sixty (60) days, it would no longer be providing new loans beyond that date.

Pls.' Reply, ECF No. 29 at 10 (emphasis added). Plaintiffs need not be theoretical about claiming the right to sixty days of notice; such a requirement already exists in section 5.2 of the Agreement.

In fact, Plaintiffs already have a breach of contract claim for the breach of this express term of the Agreement, precluding a claim for a breach of an implied obligation. *See Chamison*, 735 A.2d at 920-921 ("[The] implied covenant is a judicial convention designed to protect the spirit of an agreement when, *without violating an express term of the agreement*, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain.") (emphasis added).[2] Accordingly, because "[t]he implied covenant does not apply when the subject at issue is expressly covered by the contract," *Airborne Health, Inc.* 984 A.2d at 146, the claim for the breach of these implied obligations will be dismissed.

### 2. Implied Obligation Three

The SAC's remaining implied obligation is "US Bank's obligation to respect the hard-earned relationships existing between National Education and the client schools." This is also clearly a restatement of the SAC's breach of contract claim, which states that Defendant violated the reputation clause of the Agreement.[3] The reputation clause of the Agreement is quite

---

[2] Moreover, as I noted once before, both parties conceded at argument that the ability of the parties to mitigate their damages upon termination was implicit within the sixty-day notice provision. 2013 WL 6228979 at *11.

[3] Section 2.6 of the Agreement, the reputation clause, states:

> Each Party is aware and hereby acknowledges the importance of the goodwill and good reputation of the other Parties in the education loan and other communities in which each Party has an interest. Each Party hereby undertakes to take no action in connection with this Agreement that reasonably may be anticipated to reflect badly on any of the other Parties or otherwise to damage any such other Party's goodwill or good reputation, or to cause such result through inaction. Each Party recognizes that such goodwill and good reputation are valuable business assets of the other Parties, and that harm to such assets may be irreparable. Violation of this provision will constitute grounds for immediate

detailed, and Plaintiffs' claim for the breach of this clause has already survived a motion to dismiss. *Cf. Chamison*, 735 A.2d at 920-921 (no claim for breach of implied covenant where there already is a breach of contract claim for a "violat[ion] an express term of the agreement"). Again, because such a duty is an explicit term of the Agreement, an implied term need not be injected here, and the claim will be dismissed. *See id.; see also Airborne Health, Inc.*, 984 A.2d at 146.

### B.  Indirect Damages

The SAC also seeks indirect damages against Defendant. In response to Defendant's argument that the Agreement precludes such damages, Plaintiffs state that these damages stem only from the breach of the implied covenant of good faith and fair dealing, not from the breach of express contract claims. Thus, pursuant to the discussion above, the claim for indirect damages, which is tethered to the good faith and fair dealing claim, fails as well.

## IV. CONCLUSION

For the above-stated reasons, Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing and for indirect damages each fail to state a claim and are dismissed with prejudice.

An implementing Order follows.

---

    termination of this Agreement by the damaged Party, without prejudice to any other rights or remedies (whether in law or equity) that may be available to it.